UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re PROS RIVERA,

       Debtor.
_____/

CHERIE IVEY,

       Plaintiff/Appellant,

    v.

PROS RIVERA,

       Defendant/Appellee.
_____/

No. C 07-4333 PJH
Bankr. Case No. 05-32090 TEC
Adv. Case No. 05-3441

**ORDER AFFIRMING JUDGMENT OF THE BANKRUPTCY COURT**

Plaintiff and appellant Cherie Ivey ("Ivey") appeals the bankruptcy court's judgment in favor of debtor and defendant/appellee Pros Rivera ("Rivera") following a bench trial in the adversary proceeding filed by Ivey against Rivera in Rivera's Chapter 7 bankruptcy case. For the reasons that follow, the court AFFIRMS the judgment of the bankruptcy court.

**BACKGROUND**

Rivera was the chief executive officer and a director of Titan Endeavors, Inc. ("Titan"), a Nevada corporation founded by Jerry Diggs[1] for the purpose of investing in real estate. After founding Titan, in May 2003, Diggs hired Rivera and issued Rivera shares of stock in Titan. Rivera's responsibilities included locating and acquiring residential real estate developments for the purpose of selling to the public. Rivera managed several of Titan's bank accounts, but Diggs was solely responsible for deciding how and when to

---

[1] Diggs passed away several years ago.

disburse Titan's funds. Over the course of approximately two and one-half years, Rivera personally loaned Titan more than $2 million from his retirement accounts, equity in his home, and from his own savings and checking accounts. Titan never repaid any of the loans; and on July 5, 2005, Rivera filed for bankruptcy under Chapter 11 of the Bankruptcy Code, which was subsequently converted to a Chapter 7 case.[2]

On October 11, 2005, Ivey filed an adversary case, claiming that debts owed to her by Titan were nondischargeable in Rivera's bankruptcy case due to fraud. Ivey's claims related to two separate loans she made to Titan in early 2005, prior to Rivera's bankruptcy filing. Ivey's first loan was in the amount of $150,000, and was made in January 2005. The second loan was for $175,000, and occurred in February 2005. In her adversary complaint, Ivey claimed that both the $150,000 and $175,000 debts incurred by Titan were nondischargeable under Bankruptcy Code § 523(a)(2)(A).

### a.  $150,000 Loan

Ivey was seeking investment opportunities when one of her family members put her in touch with Diggs, Titan's founder, in January 2005. At the time, Ivey already had several real estate investments. Ivey, formerly an elementary school principal in Oakland, California, first met with Diggs when he came to her school in January 2005. Diggs presented Ivey with an opportunity to invest in condominiums that were allegedly under construction in Millbrae, California ("Millbrae project"). Following this meeting, Ivey consulted with her attorney, who advised her to secure any loan(s) that she made.

She talked to Diggs several times following their first meeting, after which she agreed to loan Titan $150,000 in exchange for Titan's agreement to pay her $300,000 from the Millbrae project escrow, and to assign her two three-bedroom condominiums from the Millbrae project, each valued at $899,000, following the project's completion. Additionally, Diggs promised Ivey a deed of trust from Titan's president, Rivera, on his home.

---

[2] Neither Diggs nor Titan ever filed for bankruptcy; and there is no dispute that Rivera filed for bankruptcy only in his individual capacity and not on behalf of Titan.

On January 27, 2005, Ivey met Diggs and Rivera at a Bank of America branch in Oakland, California. This was the first time that Ivey had ever met or spoken to Rivera. Ivey presented Diggs and Rivera with a cashier's check made out to Titan in the amount of $150,000, and in return, received a packet of information, which included other investment opportunities. Additionally, Ivey received a memorandum of agreement memorializing her agreement with Titan, a promissory note, and a deed of trust on Rivera's home in Foster City. The deed of trust specified that the interest in the property was being granted by "Pros Robert Rivera, a married man as his sole and separate property." Exh. 7. Rivera subsequently deposited Ivey's check into Titan's bank account. A couple days later, Ivey noticed that, contrary to her prior verbal agreement with Diggs, the promissory note that she received stated that it was due and payable on February 26, 2006, instead of February 26, 2005. She contacted Diggs, who provided her with a new note payable on February 26, 2005.

At trial, Ivey conceded that she had never discussed the specific terms of the deal with Rivera, but claims that Rivera implied that he had sole title to the house for which he was granting her a deed of trust. Rivera testified that he could not recall the specifics of any of his communications with Ivey at the bank on January 27, 2005, but that he in fact personally handed Ivey the packet of information, which contained the promissory note, deed of trust, and information on other investment opportunities.

Ivey and Rivera did not speak again following the January 27, 2005 meeting at the bank.

**b.    $175,000 Loan**

Following her January 27, 2005 loan, Ivey again met with Diggs and spoke with him several times regarding another one of Titan's alleged projects, condominiums that were being developed in Oakland ("Oakland project"). On February 24, 2005, Ivey subsequently gave Diggs two cashier checks totaling $175,000. In return, Diggs agreed that Titan would reimburse Ivey the $175,000 principal plus an additional $100,000 within thirty days of the

close of escrow. Exh. 15. Alternatively, if the financing for the Oakland project was not successfully consummated, then Ivey was to be immediately reimbursed for her $175,000. However, if financing was completed successfully, then Ivey was to continue receiving additional payments totaling $5 million.

Rivera never met with or spoke to Ivey regarding the Oakland project, and was out of the country at the time that she entered into the agreement with Diggs. Additionally, the $175,000 was also deposited into a different bank account from that managed for Titan by Rivera.

Ivey never received any payments on the $150,000 and $175,000 loans. However, in 2006, during the course of Rivera's bankruptcy case, Rivera's home, which he owned with his wife as a joint tenant, was sold during foreclosure proceedings instituted by Ivey. The bankruptcy court approved the Chapter 7 trustee's distribution of a portion of the sale proceeds to Rivera's wife based on her interest as a joint tenant, over Ivey's objection. However, Ivey ultimately received approximately $78,000 from the foreclosure proceeds, which represented Rivera's interest in the property, in satisfaction of her deed of trust on the property.

Subsequently, on June 27, 2007, in the adversary case initiated by Ivey, the bankruptcy court held a bench trial at which both parties introduced numerous exhibits, and during which both Ivey and Rivera testified. Following the trial, the bankruptcy court held that Ivey's $150,000 and $175,000 loans were dischargeable in Rivera's bankruptcy case, and this appeal followed.

## DISCUSSION

**A.    Standard of Review**

The court reviews the bankruptcy court's conclusions of law de novo, and its findings of fact for clear error. *Citibank v. Eshai (In re Eshai)*, 87 F.3d 1082, 1086 (9th Cir. 1996). A factual finding is clearly erroneous if, after examining the evidence, the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Anderson v.*

4

*City of Bessemer*, 470 U.S. 564, 573 (1985).

**B.     Legal Standards**

A central purpose of the Bankruptcy Code is to allow an honest but unfortunate debtor to get a fresh start. *In re Apte*, 96 F.3d 1319, 1322 (9th Cir. 1996) (quoting *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)). A dishonest debtor, on the other hand, will not benefit from his wrongdoing. *Id.* Consistent with this policy, not all debts in bankruptcy are dischargeable. *Id.*

Bankruptcy Code § 523(a)(2)(A) provides in pertinent part:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt —
>
> (2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by–
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

To except a debt from discharge under § 523(a)(2)(A), the creditor must show: (1) that the debtor made a representation; (2) the debtor knew at the time the representation was false; (3) the debtor made the representation with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained damage as the proximate result of the representation. *In re Eshai*, 87 F.3d at 1086. These elements must be proved by the preponderance of the evidence. *Id.* at 1087.

"[A] false representation may be established by an omission when there is a duty to disclose." *Id.* at 1089. Provided the debtor has a duty to disclose, "[o]ne who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose." *Id.*

The general rule is that a person may justifiably rely on a representation even if the falsity of the representation could have been ascertained upon investigation. *In re Kirsh,*

5

973 F.2d 1454, 1458 (9th Cir. 1992). In other words, "negligence in failing to discover an intentional misrepresentation is no defense." *Id.* at 1459. However, a person cannot rely on a representation if "he knows that it is false or its falsity is obvious to him." *Id.* at 1458. In sum, although a person ordinarily has no duty to investigate the truth of a representation, "a person cannot purport to rely on preposterous representations or close his eyes 'to avoid discovery of the truth.' " *Id.* at 1459.

**C.     Bankruptcy Court's Ruling**

It is important to note at the outset that in its ruling and judgment in the adversary case, the bankruptcy court *did not* finally resolve the *validity* of Ivey's claims against Rivera's estate. *See* October 3, 2007 Bankruptcy Court Order re: Trustee's Objections to Claims (noting that its judgment in the nondischargeability adversary proceeding "did not address the validity of the claims. . . but only whether those claims would pass through the [d]ebtor's bankruptcy").[3] Instead, *assuming without deciding that the claims were valid claims against Rivera's estate*, the bankruptcy court resolved whether fraud or other false pretenses precluded the claims from passing through and being discharged by Rivera's bankruptcy case. *See id; see also* June 27, 2007 Trial Transcripts at 11-13, 168. Accordingly, to the extent that Ivey attempts to raise issues regarding the validity of the claims in this appeal, those issues are beyond the scope of the bankruptcy court's judgment as to dischargeability, and thus beyond the scope of this appeal.

The bankruptcy court ruled on the record following the bench trial on June 27, 2007.

---

[3] The allowance and validity of Ivey's claims is governed by Bankruptcy Code §§ 501 and 502, and is distinct from the claims' dischargeability under § 523(a)(2)(A). In this case, Ivey filed several claims in accordance with § 501 in Rivera's main bankruptcy case. The Chapter 7 trustee objected under § 502 to Ivey's claims based on the $150,000 and $175,000 loans, contending that Rivera's estate was not liable for the loans because they were owed by Titan and not by Rivera. Initially, the bankruptcy court sustained the trustee's objections to the claims and disallowed the claims in their entirety, based at least in part on Ivey's failure to timely respond to the trustee's objections. However, upon Ivey's motion for reconsideration, the bankruptcy court subsequently withdrew its order disallowing the claims as moot, based on the fact that Rivera's bankruptcy estate lacked sufficient funds to make any distributions on the claims regardless of their validity, and thus declined to make any findings regarding the validity of the claims. *See* Bankruptcy Court's October 31, 2007 Order.

6

It noted the five elements that Ivey was required to prove under § 523(a)(2)(A) in order to establish that the debts were nondischargeable. The court then divided Titan's alleged representations into two categories: those related to the deed of trust, and other promises to repay both loans outside of the deed of trust.

Turning first to the deed of trust, the court ultimately found that there was no evidence that Titan and/or Rivera represented to Ivey that Rivera held an interest in the entire property pledged. It also found that Rivera had not made any such representations in his January 27, 2005 conversation with Ivey at the bank. The court further found that there was no evidence that Titan and/or Rivera represented that Rivera's property interest securing the note was sufficient to fully cover the $150,000 debt.

As for the language utilized by the deed of trust itself, which specified that the interest in the property was being granted by "Pros Robert Rivera, a married man as his sole and separate property," the court found that the language could constitute a misrepresentation and could have conceivably created an impression that Rivera owned the entire property. However, the court concluded that there was no evidence that Titan and/or Rivera intentionally utilized that particular language in order to deceive Ivey.

Additionally, the court implied that Ivey could not justifiably rely on the language in the deed of trust as a representation that the property was sufficient to fully secure the debt given the "exceptionally high rate of return" that she was promised. Transcripts at 164. It held that given the circumstances of the "phenomenal" deal, Ivey was "obligated to look at [the] case a little bit [more] closely." Transcripts at 164.

Turning to Titan's other promises to repay both the $150,000 and $175,000 debts, the bankruptcy court noted that Titan represented to Ivey that it was attempting to successfully complete the underlying condominium projects, and that it would repay Ivey from the proceeds of the condominium projects if they sold. The court did not resolve whether those representations were false and/or made with the intention and purpose of deceiving Ivey, but instead simply ruled that Ivey could not justifiably rely on the

7

representations, citing the leading Supreme Court case on the issue, *Field v. Mann*. 516 U.S. 59 (1995). In support, the court noted that it was considering Ivey's education and experience, and held that she fell into a "sort of middle category." Transcripts at 166. It also noted that she was not an investment or real estate professional, but that she held a college degree and had bought and sold real estate before. *Id.*

The bankruptcy court further noted the "phenomenal" rate of return that Ivey was being offered on both the $150,000 and $175,000 loans. It noted that with respect to the $150,000 loan, Ivey was offered not only a one hundred percent return on the loan *within a month of making the loan*, but was also promised an additional $150,000 profit when the condominiums closed escrow plus two condominiums, worth nearly $1.5 million. It found that this exceptional rate of return, plus the fact that Ivey failed to conduct any of her own due diligence into whether Titan owned the condominiums and the status of the projects, made Ivey's reliance on Titan's representations unreasonable. The court found that had Ivey conducted some due diligence, she would have discovered that Titan "was not a good organization that [she] wanted to loan money to." Transcripts 168.

**D.   Analysis**

Ivey has set forth four issues in her statement of issues on appeal. However, as framed, the issues are somewhat overlapping and several misstate the appropriate standard of review to be applied by the court. Accordingly, the court has recharacterized the issues to some degree, which include whether:

(1) the bankruptcy court erred when it failed to issue written findings of fact and conclusions of law, but simply ruled from the bench following the bench trial;

(2) the bankruptcy court erred in concluding that Rivera did not fraudulently misrepresent his property interest in the home pledged pursuant to the deed of trust;

(3) the bankruptcy court erred in concluding that the debts were

dischargeable in spite of evidence suggesting that Titan was not properly capitalized and was not properly registered in the State of California; and (4) the bankruptcy court failed to consider evidence regarding the plaintiff's and defendant's backgrounds and experience in ruling that the debts were dischargeable.

### 1. Bankruptcy Court's Failure to Make Written Findings of Fact and Conclusions of Law

Federal Rule of Bankruptcy Procedure ("FRBP") 7052 states that Federal Rule of Civil Procedure ("FRCP") 52 applies in adversary proceedings. FRCP 52(a)(1) provides in pertinent part:

> (a) Findings and Conclusions.
>
> (1) In General. In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

The standard for adequacy of factual findings is "whether they are explicit enough on the ultimate issues to give the appellate court a clear understanding of the basis of the decision and to enable it to determine the grounds on which the trial court reached its decision." *In re Leavitt*, 171 F.3d 1219, 1223 (9th Cir. 1999) (citations omitted). The appellate court may affirm the lower court on any ground fairly supported by the record. *Id.* Where the lower court rules from the bench, express written findings are unnecessary if "a complete understanding of the issues may be had from the record without the aid of separate findings." *Id.*

Here, Ivey mischaracterizes the bankruptcy court's findings of fact as "rambling," and argues that the bankruptcy court erred in failing to make any findings regarding the existence of fraud. The court has reviewed the transcripts of the bankruptcy court's ruling, and finds no merit to this argument. Nearly ten pages of the transcripts are devoted to the bankruptcy court's ruling, and the court clearly set forth the legal standards that it was

applying, categorized the various promises and representations and related rulings in a comprehensible and organized fashion, and clearly explained the factual findings underlying its ruling. As for the existence of fraud or false pretenses, the bankruptcy court did not need to reach that nondischargeability element because it found that, regardless of whether Titan's representations were fraudulent, Ivey did not justifiably rely on them. Accordingly, the absence of justifiable reliance supported the bankruptcy court's ultimate determination that the debts were dischargeable.

In sum, the court concludes that the bankruptcy court's oral ruling made sufficiently clear reference to the facts established by the evidence and provided a clear and complete understanding of the basis for its ruling.

### 2. Representations Regarding Rivera's Property Interest Referenced in the Deed of Trust

Ivey is not entirely clear in her argument on this issue, but it appears that she contends that the bankruptcy court erred when it refused to find the $150,000 debt nondischargeable based on the representation contained in the deed of trust. As noted, the court found that the language contained in the deed of trust - which specified that the interest in the property was being granted by "Pros Robert Rivera, a married man as his sole and separate property" – could constitute a misrepresentation and could have conceivably created an impression that Rivera owned the entire property. However, the court concluded that there was no evidence that Titan and/or Rivera intentionally utilized that particular language in order to deceive Ivey. Additionally, the court implied that Ivey could not justifiably rely on the language in the deed of trust as a representation that the property was sufficient to fully secure the debt given the "exceptionally high rate of return" that she was promised.

Having reviewed the entire record, this court cannot conclude that the bankruptcy court's credibility findings or its findings regarding Rivera's purpose in using the language were clearly erroneous. Instead, the record demonstrates the opposite. The bankruptcy court was therefore permitted to rely on Rivera's testimony and evidence to the contrary.

10

Nor was the bankruptcy court's related finding regarding justifiable reliance clearly erroneous. *See Kirsch*, 973 F.2d at 1456 ( "[t]he determination of justifiable reliance is a question of fact subject to the clearly erroneous standard of review"). Ninth Circuit law is clear that one cannot justifiably rely on "preposterous" representations. *Id.* at 1459. It was not clearly erroneous for the bankruptcy court to conclude that Ivey had a heightened duty to investigate the legitimacy of the transaction given that she was promised a return of nearly 1100% -- $1.8 million in exchange for her $150,000 loan.

### 3. Evidence re: Titan's Corporate Status

Ivey additionally argues that the bankruptcy court erred in finding the debts dischargeable given evidence that Titan was never properly capitalized, and that it did business in California without registering as a foreign corporation.

Ivey also raised these issues in her trial brief filed with the bankruptcy court prior to the bench trial. However, following Rivera's motion in limine, the bankruptcy court specifically ruled that evidence on the above issues was not relevant in the nondischargeability bench trial because Rivera was willing to stipulate that given his role and ownership interest in Titan, he may be held liable for certain of Titan's debts *as long as Ivey was able to prove the requisite five elements for nondischargeability. See* Transcripts at 13-14.[4] In light of Rivera's stipulation, Ivey agreed that the above evidence need not be admitted. *Id.*

Given Rivera's stipulation in favor of Ivey, the bankruptcy court did not abuse its discretion in declining to consider the above evidence in conjunction with its judgment of dischargeability.

### 4. Evidence re: Ivey's and Rivera's Backgrounds

Ivey also suggests that the bankruptcy court failed to adequately consider evidence

---

[4] In support, the bankruptcy court stated: "I think [Rivera's] ownership of the shares [of Titan] or his assertion of ownership of the shares give him enough interest that if he made misrepresentations covered by 523(a)(2), he can be held liable for the amount of money received and the defendant does not dispute that." Transcripts at 14.

11

regarding her experience and background and that of Rivera in its ruling and judgment. This simply is not the case. As noted above, the court specifically considered Ivey's background and experience in determining whether or not her reliance on representations was justifiable. Additionally, the court also considered extensive evidence regarding Rivera's background, based both on his testimony at trial and on his deposition testimony and accompanying exhibits.

Accordingly, the court concludes that the bankruptcy court's findings regarding Ivey's background and her justifiable reliance were not clearly erroneous, and also finds that the court did not abuse its discretion by failing to adequately consider evidence regarding Rivera's background and experience.

## CONCLUSION

For the reasons set forth above, the court AFFIRMS the judgment of the bankruptcy court denying Ivey's nondischargeability claims.

**IT IS SO ORDERED.**

Dated: June 19, 2008

_____
PHYLLIS J. HAMILTON
United States District Judge